J-A26016-20

2021 PA Super 13

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                :            PENNSYLVANIA
                :
          v.             :
                :
                :
JOSEPH WILLIAMS          :
                :
        Appellant      :   No. 1824 EDA 2019

Appeal from the Judgment of Sentence Entered May 3, 2019
In the Court of Common Pleas of Bucks County Criminal Division at
No(s):  CP-09-CR-0004366-2018

BEFORE:   BENDER, P.J.E., LAZARUS, J., and STEVENS, P.J.E.[*]

OPINION BY LAZARUS, J.:              **FILED JANUARY 26, 2021**

Joseph Williams appeals from the judgment of sentence, entered in the Court of Common Pleas of Bucks County, following his convictions by a jury of two counts of first-degree murder[1] and one count each of criminal attempt to commit homicide,[2] firearms not to be carried without a license,[3] recklessly

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 2501(a).

[2] 18 Pa.C.S.A. § 901.

[3] 18 Pa.C.S.A. § 6106(a)(1).

endangering another person (REAP),[4] possessing an instrument of crime (PIC),[5] and tampering with or fabricating physical evidence.[6]

Williams' convictions stem from his role in the shooting deaths of Tommy Ballard and Zyisean McDuffie outside of April Coleman's home, 914 Elmhurst Avenue, in Bristol, Pennsylvania, on May 4, 2018.  On that date, Coleman hosted a party for her two children who planned to attend their high school prom later that evening.  Several family friends were present, including Williams, Gary Goddard, Jr.,[7] Tajon Skelton, Rayshaun James, and Sincere McNeil.  These individuals were all gathered around Coleman's Chrysler Pacifica, which was parked on her front lawn area.  At one point, James and Williams walked away together—outside the view of area pole cameras—so that James could discreetly give Williams a firearm, which Williams placed into his waistband.  **See** N.T. Jury Trial, 3/12/19, at 178-80.  Shortly thereafter, McDuffie arrived at the Coleman residence, approached the group at the Chrysler Pacifica, and shook hands only with Williams.  Williams then asked

---

[4] 18 Pa.C.S.A. § 2705.

[5] 18 Pa.C.S.A. § 907(a).

[6] 18 Pa.C.S.A. § 4910.

[7] At trial, Gary Nathaniel Goddard, Jr., was sometimes referred to as "Static" or "Little Gary."  For clarity, we refer to him exclusively as "Goddard, Jr." Goddard, Jr., is the son of Gary Goddard, who is Williams' co-defendant, and who was charged separately in connection with the same shooting incident. We consider Gary Goddard's appeal separately at **Commonwealth v. Goddard**, 2097 EDA 2019.

why McDuffie did not acknowledge the others, at which point McDuffie stated that he "didn't mess with none of [them]" and called them all "bitch." *Id.* at 190. At the end of the verbal confrontation, McDuffie left, stating he would return soon.

When McDuffie returned about forty-five minutes to an hour later, he was accompanied by Ballard, Jahmier Wilson, and Jackie Valentine; Williams and Wilson then walked away together to have a private conversation. Within the larger group, still standing around the Chrysler Pacifica, an argument ensued amongst Goddard, Jr., McNeil, McDuffie, and Ballard. McDuffie punched Goddard, Jr., in the face, and within moments, Williams removed the firearm from his waistband and began firing it at Wilson, who was running away from him. N.T. Jury Trial, 3/15/19, at 110-14; N.T. Jury Trial, 3/18/19, at 170-73. Although Williams fired repeatedly at Wilson, Wilson was not injured, but McDuffie and Ballard were struck. Ballard collapsed in the front yard of 911 Elmhurst Avenue and McDuffie was struck but still standing in the driveway of 916 Elmhurst Avenue.

Gary Goddard then appeared, walking down Weston Avenue, with his hand raised and wielding a firearm. N.T. Jury Trial, 3/13/19, at 281-84. Standing in front of 916 Elmhurst Avenue, Goddard fired in the direction of the homes, and then at McDuffie, whose legs gave out from under him after the shots were fired. N.T. Jury Trial, 3/18/19, at 67-68. Goddard stood over McDuffie and discharged his firearm, lodging a bullet in McDuffie's head just

above the hairline. N.T. Jury Trial, 3/13/19, at 288; N.T. Jury Trial, 3/18/19, at 117-22, 226-29.

Williams, Skelton, and James fled the scene of the shooting towards Skelton's home, located at 816 Winder Drive. After only a short time, Lemuel Skelton, Skelton's father, became aware of the shooting, and directed Williams and James to leave his residence. Before leaving, Williams took Tajon Skelton's white polo shirt. When police arrived at the Skelton residence, officers found Williams' abandoned red shirt in a trashcan as a result of a consensual search.

While conducting a search in the area of the shooting, police observed Williams running shirtless through a wooded brush area with James. Officers overheard Williams tell James, "Don't worry about it; you didn't do nothing wrong." N.T. Jury Trial, 3/7/19, at 168-69. Upon being discovered by the officers, Williams stated to the police, "Sir, please put me in handcuffs. I don't want to die." *Id.* at 170-71. Police found Tajon Skelton's white polo shirt in Williams' pants pocket.

The officers subsequently reviewed video footage from pole cameras near the scene of the shooting. In the footage, police observed Williams, James, and Skelton running away from the shooting down Winder Drive. Williams was wearing a red shirt as he fled the scene. The three fleeing individuals entered the backyard of 703 Winder Drive, remained off-camera for one minute and thirty seconds while in the yard, and reemerged on camera travelling further down Winder Drive. The footage of Williams running shows

- 4 -

his hands located around his belt area prior to entering the rear yard of 703 Winder Drive, but after leaving, his hands were no longer in his belt area. Police were dispatched to that address, where the owner of the property consented to a search. Police noticed a grill, which was completely covered in dirt and grime, except for the left handle. After searching the grill, police recovered a Rossi .38 Special revolver sticking out of the back near the propane tank. All five of the revolver's cartridges were spent, and it contained shell casings. Skelton confirmed through testimony at trial that Williams was the only one who approached the grill when the three individuals were in the rear yard of 703 Winder Drive. *See* N.T. Jury Trial, 3/8/19, at 171-73.

Other testimony revealed that Goddard, Jr., chased Wilson from the scene of the shooting, gun in hand and pointed forward with his arm fully extended. *See* N.T. Jury Trial, 3/15/19, at 38-41; *see also* N.T. Jury Trial, 3/18/19, at 223-25.

When police arrived at the scene, Officer Michael Sarciewicz first found Ballard, who was still able to talk and move, lying in the grass at 911 Elmhurst Avenue. A crowd then directed the officer to McDuffie, who was unresponsive, located in front of 916 Elmhurst Avenue. The officer observed bleeding and several gunshot wounds on McDuffie, and commenced cardiopulmonary resuscitation (CPR). McDuffie and Ballard were both transported to Frankford-Torresdale Hospital, where McDuffie was pronounced dead on arrival, and Ballard pronounced dead shortly after arrival.

Doctor Zhonghue Hua conducted the autopsies of Ballard and McDuffie. Ballard was nineteen years old and suffered three gunshot wounds: one to his left lower chest area, which punctured his liver and injured the right kidney; one on his left side, with an exit wound above his buttocks; and one graze wound to his thumb. The bullet from Ballard's first wound, which was still lodged in his body, was removed and turned over to investigators. Doctor Hua determined that the wound to Ballard's torso was the cause of his death, and deemed it a homicide. *See* N.T. Jury Trial, 3/11/19, at 180-88. McDuffie was also nineteen years old and suffered five gunshot wounds, including one each to his forehead above the hairline, his left upper back, his right flank, his right kneecap, and a graze wound to his right upper chest. Doctor Hua determined the fatal injury was the gunshot wound to his right flank, which punctured McDuffie's kidney. *Id.* at 193-94. Intact bullets were removed from McDuffie's kneecap, head, and abdomen, and were turned over to investigators. Doctor Hua concluded McDuffie was still alive at the time he was shot in the head due to evidence of brain bleeding, that the cause of death was multiple gunshot wounds, and that the manner of death was homicide. *Id.* at 215.

Police additionally removed two bullets from 914 Elmhurst Avenue—one had been lodged in the siding of the residence; the other entered a window, proceeded through the kitchen, through a box of cereal, and into the wall before striking a flue and falling onto the utility room floor. *See* N.T. Jury Trial, 3/6/19, at 212-23, 227. Eric Nelson, of the Montgomery County

Detectives,[8] conducted a forensic examination of all six of the recovered bullets. The bullet recovered from the utility room and the one recovered from McDuffie's skull were discharged from a .32 H&R revolver found by police in Gary Goddard's apartment. The fatal bullets recovered from McDuffie's abdominal wall and Ballard's right torso were shot from the .38 Rossi Special firearm, which was recovered from the grill behind 703 Winder Drive. The other bullets recovered from McDuffie's right knee and the siding of 914 Elmhurst Avenue were not traced to a known firearm, but were revealed to have been fired from a firearm similar to a .38 revolver or .9 mm pistol. *See* N.T. Jury Trial, 3/13/19, at 232-39.

On May 5, 2018, the Commonwealth charged Williams with, *inter alia*, criminal homicide in connection with the shooting deaths of Ballard and McDuffie. At a preliminary hearing, the court permitted the Commonwealth to amend the charges, held all charges for court, and docketed the case at docket number 4366-2018. On August 14, 2018, the Commonwealth filed a criminal information reflecting the amendments.[9] On October 18, 2018, the

---

[8] Detective Nelson explained that, although he works for the Montgomery County Detectives, he often does work for the "surrounding counties," including Bucks County. *See* N.T. Jury Trial, 3/13/19, at 213.

[9] The information charged Williams as follows: Count 1 – first-degree murder; Count 2 – first-degree murder; Count 3 – criminal attempt to commit homicide; Count 4 – aggravated assault; Count 5 – possession of a firearm by a person prohibited; Count 6 – discharge of a firearm into an occupied structure; Count 7 – firearms not to be a carried without a license; Count 8 – REAP; and Count 9 – PIC.

Commonwealth separately charged Williams at docket number 7352-2018 in connection with the unlawful sale and transfer of the firearm that was used to kill Ballard and McDuffie.[10]  At a preliminary hearing held on December 18, 2018, the court held all charges for court, and docketed that case at docket number 7352-2018.

On March 4, 2019, the court held a hearing prior to the commencement of trial to resolve outstanding pretrial matters.  At that hearing, the court granted the Commonwealth's motion to consolidate the two cases against Williams with the case against Gary Goddard for a joint jury trial.  The court also granted Williams' motion to sever the charge of possession of a firearm by a person prohibited.

A joint jury trial commenced on March 4, 2019, and concluded on March 22, 2019.  At the close of deliberations, the jury convicted Williams of the above-stated offenses.  During the trial, the court granted the Commonwealth's motion to *nolle prosequi* the charge of aggravated assault, and granted Williams' demurrer as to the crimes of discharging of a firearm into an occupied structure, dealing in proceeds of unlawful activities, criminal conspiracy to commit sale or transfer of firearms, and sale or transfer of a firearm.  After trial, the court granted the Commonwealth's motion to *nolle*

_____

[10] The Commonwealth charged Williams as follows:  dealing in proceeds of unlawful activities, 18 Pa.C.S.A. § 5111(a)(2); criminal conspiracy to commit sale or transfer of firearms, 18 Pa.C.S.A. § 903; sale or transfer of firearm, 18 Pa.C.S.A. § 6111(g)(2); and tampering with or fabricating physical evidence,  18 Pa.C.S.A. § 4910.

*prosequi* possession of a firearm by a person prohibited, which had been previously severed.

On May 3, 2019, as to docket number 4366-2018, the court sentenced Williams on Count 1 (first-degree murder) to a period of incarceration of life without the possibility of parole; Count 2 (first-degree murder) to a term of incarceration of life without the possibility of parole, to be served consecutively to Count 1; Count 3 (criminal attempt to commit homicide) to a term of 120 to 240 months' incarceration; Count 7 (firearms not to be carried without a license) to a term of 42 to 83 months' incarceration; Count 8 (REAP) to a term of 12 to 24 months' incarceration; and Count 9 (PIC) to a term of 30 to 60 months' incarceration, with Counts 3, 7, 8, and 9 to be served concurrently to Counts 1 and 2. As to docket number 7352-2018, the court sentenced Williams to 12 to 24 months' incarceration to be served concurrently with the two consecutive life sentences docketed at 4366-2018.

On May 13, 2019, Williams filed a post-sentence motion under docket number 4366-2018, which the court denied on May 29, 2019. On June 20, 2019, Williams filed a notice of appeal as to docket number 4366-2018. On June 25, 2019, the trial court ordered Williams to file a concise statement of errors complained of on appeal no later than 21 days subsequent, pursuant to Pa.R.A.P. 1925(b). On August 1, 2019, Williams filed an untimely Rule

1925(b) statement.[11]  The court subsequently filed a joint opinion as to both

Williams' and Goddard's appeals, pursuant to Pa.R.A.P 1925(a).

On appeal, Williams presents the following issues for our review:[12]

1. Did the [c]ourt err in refusing to allow [Williams] to impeach
   the hearsay testimony of [Justin Olexovitch,] a Commonwealth
   witness?

2. Did the [c]ourt err in admitting a letter [Williams] wrote from
   prison to [William Flemming, his cousin,] that had no relevance
   to the criminal acts charged in the information?

Appellant's Brief, at 3.

Both of Williams' issues present evidentiary challenges.  We review a

trial court's decision of whether or not to admit evidence under the following

well-established standard:

> The admissibility of evidence is a matter for the discretion of the
> trial court and a ruling thereon will be reversed on appeal only
> upon a showing that the trial court committed an abuse of
> discretion.  An abuse of discretion may not be found merely
> because an appellate court might have reached a different
> conclusion, but requires a result of manifest unreasonableness, or

---

[11] Despite Williams' untimely-filed Rule 1925(b) statement, this Court may
consider the merits of his appeal.  **See Commonwealth v. Thompson**, 39
A.3d 335, 340 (Pa. Super. 2012) ("When counsel has filed an untimely Rule
1925(b) statement and the trial court has addressed those issues[,] we need
not remand and may address the merits of the issues presented.").  The court
addressed Williams' issues in its Rule 1925(a) opinion; therefore, we may
proceed to the merits of his appeal.

[12] Due to a conflict of interest arising from court-appointed appellate counsel's
representation of Williams, **see** Motion to be Withdrawn as Counsel, 4/16/20,
Attorney Stuart Wilder, Esquire, entered his appearance before this Court on
April 15, 2020, following his appointment in the trial court.  We then permitted
Attorney Daniel Schatz, Esquire's withdrawal.  **See** Order Granting Application
to Withdraw as Counsel, 4/27/20.  Attorney Wilder filed a timely appellate
brief raising the issues contained herein.

partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

***Commonwealth v. McClure***, 144 A.3d 970, 975 (Pa. Super. 2016) (quoting ***Commonwealth v. Poplawski***, 130 A.3d 697, 716 (Pa. 2015)) (internal citations and quotation marks omitted).

First, Williams argues that the court erred when it denied his motion to call Detective Gregory Beidler to the stand. Specifically, Williams argues that he should have been permitted to impeach, through the testimony of Detective Beidler, a hearsay declaration made by Justin Olexovitch, pursuant to Pa.R.E. 806 and the Confrontation Clause. We agree with Williams that there was error, but, as explained in greater detail below, determine that the error was harmless.

At trial, the Commonwealth called Rayshaun James to testify that Justin Olexovitch gave him a gun with instructions to give that weapon to Williams. ***See*** N.T. Jury Trial, 3/12/19, 163-64. The Commonwealth offered James' testimony to support a conviction for Williams' alleged conspiracy to commit sale or transfer of firearms.[13] This hearsay statement—James' testimony that Olexovitch instructed James to give the gun to Williams—was admitted as a statement uttered in furtherance of an alleged conspiracy, pursuant to Pa.R.E.

---

[13] Other evidence introduced by the Commonwealth which supported this charge included: the unlawful purchase of the murder weapon by a straw purchaser; how the gun came into Olexovitch's possession; and, that James gave Williams the firearm, who only a short time later, used it to murder Ballard and McDuffie. As previously noted, the court ultimately granted Williams' demurrer with regard to this charge.

- 11 -

803(25)(E). **See** N.T. Jury Trial, 3/20/19, at 125; **see also** Trial Court Opinion, 3/3/20, at 28-30.

Before resting, the defense made a motion to call Detective Beidler to the stand. **See** N.T. Jury Trial, 3/20/19, at 124-28. Williams notified the court that Detective Beidler would testify that when he interviewed Olexovitch, Olexovitch stated that he gave no one instructions to give a gun to Williams. Williams claims that this evidence should have been admitted under Rule 806 because it impeaches Olexovitch's previously-admitted hearsay statement, which was entered into evidence via Rayshaun James' testimony. **See** Appellant's Brief, at 11.

As noted above, the trial court denied Williams' motion to call Detective Beidler. The court stated for the record that it made its decision in light of the fact that it had already granted Williams' demurrer as to conspiracy to commit sale or transfer of firearms. **See** N.T. Jury Trial, 3/20/19, at 127. The court opted, instead, to provide the jury with a cautionary instruction: that any mention of Olexovitch should be disregarded. **Id.** at 128 ("I'm going to give the jury an instruction; that they may have heard the name Justin Olexovitch, but that they should not in any way consider what reference was made to him in their deliberations because he's not a party, and for those reasons I've given a special instruction not to consider any connection to Justin Olexovitch by any issue in this case.").

Nevertheless, the instruction given to the jury differed materially from what had been previously discussed on the record, insofar as the court

- 12 -

permitted the jurors to determine **for themselves** the importance of

Olexovitch's hearsay declaration, rather than instructing that Olexovitch had

no connection to Williams' case:[14]

> Members of the jury, there was a mention, and it's for you to remember, of a person named Justin Olexovitch in this case. I'll tell you now that he is not on trial here. Even though he was mentioned, **it's for you to recall how important his testimony may have been**. I mentioned to you certain witnesses were not called and the inference you can draw when I mentioned Jahmier Wilson, but with regard to Justin Olexovitch, it's enough for me to tell you that he did not have to testify in this case because he possessed a legal privilege not to testify, you should not draw an inference of whether his testimony would have been favorable to the Commonwealth or the defense, and if he has refused to testify because of this special legal privilege, no inference should be drawn by you with regard to this testimony, and I'll tell you now that you shouldn't consider and give great weight to the fact that

---

[14] The trial court's Rule 1925(a) opinion and the Commonwealth's brief apparently misapprehended Williams' present claim of error: the trial court understood Williams to be objecting to James' testimony on the grounds of inadmissible hearsay, *see* Trial Court Opinion, 3/3/19, at 28-30, while the Commonwealth characterizes Williams' early attempts to grant Olexovitch immunity as the genesis of his claim. *See* Appellee's Brief, at 21-24. Although a similar trial purpose is evident in each of these strategies, Williams' present claim stems from his motion to call Detective Beidler to the witness stand to impeach Olexovitch's hearsay declaration, pursuant to Rule 806, *see* N.T. Jury Trial, 3/20/19, at 124-28; **not** Williams' objection to James' testimony as hearsay, *see* N.T. Jury Trial, 3/12/19, 163-64, or his motion to grant Olexovitch immunity to testify. *See* N.T. Pre-Trial Hearing, 3/4/19, at 102-08. Additionally, both the trial court's Rule 1925(a) opinion and the Commonwealth's brief would have this Court find that the court's cautionary instruction cured any error with regard to Williams' claim. *See* Trial Court Opinion, 3/3/19, at 30; *see also* Appellee's Brief, at 23-24. Nevertheless, the court's instruction failed to address Rule 806 in any material way—likely as the result of the same misapprehension—and, therefore, was not curative. *See* N.T. Jury Trial, 3/21/19, at 61-62; *see also Commonwealth v. Maloney*, 365 A.2d 1237, 1241 (Pa. 1976) ("[A]dequate instructions under some circumstances may cure error[.]").

his name was mentioned **except as it appeals to you in proving the case against these defendants**.

N.T. Jury Trial, 3/21/19, at 61-62 (emphasis added).

Williams argues that James' testimony—that Olexovitch instructed James to give the gun to Williams—bolstered the Commonwealth's claim that Williams possessed the illegally-purchased murder weapon. Williams argues that the admission of this testimony ultimately helped prove the Commonwealth's homicide cases and the remaining charges for which the jury convicted Williams. *See* Appellant's Brief, at 11; *see also* Appellant's Reply Brief, at 1. We agree; but for the reasons stated below, we also find this error to be harmless, beyond a reasonable doubt.

"All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa.R.E. 401. Moreover, hearsay evidence is generally inadmissible, though several exceptions allow for its admission. One such exception, Pa.R.E. 806 (Attacking and Supporting the Declarant's Credibility), relevant here, provides:

> When a hearsay statement has been admitted in evidence, the declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness. The court may admit evidence of the declarant's inconsistent statement or conduct, regardless of when it occurred or whether the declarant had an opportunity to explain or deny it. If the party against whom the statement was admitted calls the declarant as a witness, the party

may examine the declarant on the statement as if on cross-examination.

Pa.R.E. 806.

Here, the trial court admitted Olexovitch's hearsay statement, which was related to the jury via Rayshaun James' testimony. **See** N.T. Jury Trial, 3/12/19, 163-64. Although the Commonwealth made its evidentiary proffer in support of a charge which the court ultimately dismissed (conspiracy to commit sale or transfer of firearms), James' retelling of Olexovitch's statement also had the effect of bolstering the evidence that supported the remaining and still-pending charges. Thus, even if the conspiracy charge was no longer at issue, because Olexovitch's hearsay declaration bolstered the evidence relating to the other still-pending charges, Olexovitch's credibility was open to attack by an inconsistent statement. **See** Pa.R.E. 806; **see also Commonwealth v. Walter**, 119 A.3d 255, 288 (Pa. 2015) ("[Rule 806] provid[es] for the admission of hearsay statements challenging the credibility of the declarants of previously admitted hearsay statements.").

Williams' proposed admission of Detective Beidler's testimony, that Olexovitch denied instructing the delivery of a weapon to Williams, certainly qualifies as an inconsistent statement when compared with James' already-admitted testimony. Detective Beidler's proposed testimony was thus admissible under the rule, even if deemed hearsay. **See Walter**, **supra**. The court's instruction to the jury, having failed to address this point, did not cure the error. **See** n.12, **supra**. Nevertheless, we hold that the trial court's

error—the denial of Williams' motion to call Detective Beidler to the stand to attack Olexovitch's credibility, pursuant to Rule 806—was harmless.

Our Supreme Court has long held that:

although a perfectly conducted trial is indeed the ideal objective of our judicial process, the defendant is not necessarily entitled to relief simply because of some imperfections in the trial, so long as he has been accorded a fair trial. A defendant is entitled to a fair trial but not a perfect one. If a trial error does not deprive the defendant of the fundamentals of a fair trial, his conviction will not be reversed.

*Commonwealth v. Noel*, 104 A.3d 1156, 1169 (Pa. 2014) (quoting *Commonwealth v. Wright*, 961 A.2d 119, 135 (Pa. 2008)) (brackets and quotation marks omitted). Where a trial court has erroneously failed to admit evidence, we may find that no new trial is warranted if we are convinced the error was harmless beyond a reasonable doubt. *See Commonwealth v. French*, 578 A.2d 1292, 1301 (Pa. Super. 1990). The Commonwealth carries this burden. *Commonwealth v. Adams*, 39 A.3d 310, 322 (Pa. Super. 2012). Our Supreme Court has clarified that harmless error exists where

the record demonstrates either: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Hairston*, 84 A.3d 657, 671-72 (Pa. 2014).

Here, the Commonwealth argues that the prejudice to Williams was *de minimis* and that the properly admitted and uncontradicted evidence of

- 16 -

Williams' guilt was so overwhelming by comparison to the error, that it could not have contributed to the verdict. **See** Appellee's Brief, at 31-33. We agree.

At trial, numerous individuals testified that they saw Williams possess the gun, discharge it, or both. **See** N.T. Jury Trial, 3/12/19, at 178-79 (James testified he walked "off camera" with Williams, handed Williams firearm, and Williams placed it in waistband); **id.** at 203-07 (James testified he heard gunshot, saw Williams place firearm in waistband again, and saw Williams running with Skelton; James followed pair to rear yard where the three stayed before proceeding to Skelton's home); N.T. Jury Trial, 3/7/19, at 193-94 (Officer Dennis Leighton testified he observed pole video camera footage of scene after shooting, showing Williams entered backyard of 703 Winder Drive, waited approximately one minute before fleeing rear yard; police found murder weapon hidden inside grill in rear yard.); N.T. Jury Trial, 3/11/19, at 108-09 (Officer Edmund O'Brien testified as to observations of pole camera video, "For [] Williams, as he was running from the 600 block to the 700 [] block [of Winder Drive], his right hand was observed on his right side right around the belt loop area. . . . Coming out of [703 Winder Drive] he appears to be running as normal."); N.T. Jury Trial, 3/8/19, at 51-52 (Valentine testified that he told detectives he "watched Joey Williams [shoot] Tommy Ballard"), at 101 ("[Commonwealth Attorney:] And when he shot the gun you knew his name was Joey Williams, correct? [Jackie Valentine:] Yes. [Commonwealth Attorney:] And when he shot Tommy Ballard you knew his name was Joey Williams, correct? [Jackie Valentine:] Yes."); N.T. Jury Trial,

3/15/19, at 112-14 (April Coleman testified "I just know [Williams] stepped back, and he pulled out the gun, and I heard pow. . . . He shot again. . . . [Williams] shoots again, and then I lost view. I heard a third shot[.]"); N.T. Jury Trial, 3/18/19, at 105-07 (Krystalyn Coleman testified "[Williams] had a gun in his hands [with it pointed forward and shot it] in the direction [Wilson] was running from [sic]. . . . That's when I see [Williams]. So I froze because, I mean, I don't want to run in front of the bullets. He's shooting at him. I don't want to get hit, so I just stopped.").

Here, we find the failure to admit Williams' proposed impeachment evidence was a *de minimis* error, especially when compared to the overwhelming admitted evidence that supported findings that Williams possessed and fired the murder weapon. ***See Hairston***, ***supra***. Additionally, the Commonwealth correctly notes that once the court granted Williams' demurrer as to the conspiracy charge, the importance of Olexovitch's testimony regarding the remaining charges was greatly minimized—the manner in which Williams acquired the weapon had little significance in answering the question of whether he murdered Ballard and McDuffie and whether he intended to kill Wilson. ***See*** Appellee's Brief, at 32. Further, other evidence adduced at trial overwhelmingly supported Williams' convictions: all of the firsthand witness testimony regarding what transpired at the scene; that Williams fled the scene; that he abandoned the shirt he wore at the time of the shootings; and that he made incriminating statements at the time of his arrest. ***See Hairston***, ***supra***.

- 18 -

We find beyond a reasonable doubt that the properly admitted evidence of Williams' guilt was so overwhelming, and the prejudicial effect of the court's error regarding the failure to admit the proposed impeachment evidence so insignificant by comparison, that the error could not have contributed to the verdict. *Id.*; *see also Adams*, *supra*. Accordingly, the trial court's error did not deprive Williams of the fundamentals of a fair trial.[15] *See Noel*, *supra*.

In his second and final issue on appeal, Williams claims the trial court erroneously admitted a letter that he wrote to his cousin, William Flemming, from prison, after his arrest. *See* Appellant's Brief, at 17. Prior to trial, several members of the audience wore matching t-shirts, demonstrating their affiliation and solidarity with the parties. Some shirts bore images and nicknames of witnesses the Commonwealth intended to call. The trial court issued a warning that the trial would not be influenced in any manner, including by the wearing of matching t-shirts or by intimidation. *See* N.T. Pre-Trial Hearing, 3/4/19, at 61-66. Nevertheless, certain individuals failed to follow the court's instruction, wore matching shirts in support of Williams to trial, and were subsequently admonished by the court. *See* N.T. Jury Trial, 3/6/19, at 117-30. Upon admonishment, Flemming and another individual abandoned their shirts in the courtroom; the shirts were then placed in the

---

[15] We need not reach Williams' Sixth Amendment Confrontation Clause arguments, *see* Appellant's Brief, at 12-14, given that any error we might find would be subject to the same harmless error analysis. *See Commonwealth v. Brown*, 139 A.3d 208, 219-20 (Pa. Super. 2016) (after finding Confrontation Clause violation, this Court examines whether error was harmless beyond a reasonable doubt).

Commonwealth's custody.  Flemming's abandoned shirt had a silkscreen logo that was identical to one found on the red shirt that Williams abandoned during his flight from the crime scene, and was also the same as a hand-drawn image found on the letter that Williams wrote to Flemming from prison.  Moreover, Flemming's abandoned shirt included a variety of phrases including "#1300," which also appeared in the letter.  ***See*** N.T. Jury Trial, 3/18/19, 327-28.

The contents of Williams' letter to Flemming were read aloud to the jury and published on a monitor for viewing, but without the envelope indicating it was sent from prison.[16]  ***See*** N.T. Jury Trial, 3/18/19, 313-17.  Williams argues

---

[16] Detective Frank Groome's testimony described the letter:

[By Commonwealth Attorney:]  Taking a look at what's on the screen currently, if we could zoom in on the top left corner.  The name there is Joseph Williams; is that right?

A.  Yes, ma'am.

Q.  And it's addressed to William Flemming in Philadelphia; correct?

A.  Correct.

Q.  That's the name of the individual you saw wearing that red shirt in court?

A.  Yes.

Q.  If we could scroll down.  And we're taking a look now at an image that seems to be hand drawn.  What is that image?

A.  That's an image similar to the silkscreen that was on the shirt.

\*    \*    \*

Q. [I]f we could actually [] focus on the bottom portion, the letter portion where it begins, "Yo, Cuz." This is the body of the letter that was written and then encompassed in that envelope; correct?

A. Yes, ma'am.

Q. It says: "Yo, Cuz. I'm chillin. Just bored as shit. I had to write yall or something. The detectives came and gave me a mouth swab. I gotta beat this. I'm in it real rap bro. Make sure yall doing what yall can for me, man[n."] And there's "[OSS]"; right?

A. Yes.

\*   \*   \*

Q. "It felt like niggas forgot about me. Keep it a bean, before all this" –and then there's something that appears to be cut off— "shit. But imma be ARD, ten toes down. These crackers trippin. My Pop-Pop name Jimmy. I stand tall no matter the outcome. RS. This ain't that. I'll never sell my soul to them niggas, but my bread gettin["]—and then it just says "[OW]." It seems to be cut off. "Im at a dub. Imma try to go a week without calling yall. Make sure yall screaming for Joey on the social real rap. Fuck that. But I love yall! Supposedly the lawyer I called coming to see me this week, so I fuck around and call you then if you get to the bottom of shit. I heard Kira, your baby again. Tell her I said wassup lol. RD." Correct?

A. Yes, ma'am.

Q. And now, if we could focus on the top portion, and it says over to the right: "Jordan told me draw something for his corney [*sic*] ass designs he got on his shirts. Take a pic and send it to him." Is that what it says at the top?

A. Yes, ma'am.

Q. This is dated May 14th[, 2018]; correct?

A. Yes.

- 21 -

Q. Underneath [] on the left-hand side it says: "Target,["] then ["shoota["], ["]mood["], ["song"], ["]artist." On the right-hand side it had a number of hashtags.

A. Yes.

Q. Under where [sic] it indicates ["]target["], [is written] "[B.A.M SNM]." Do you know what that's a reference to?

A. No, I do not.

Q. Below that, it says "Shoota," [] correct?

A. Yes.

Q. And it says: "Joey twin [IAMAL"]; is that fair?

A. Yes.

Q. Below that, "Mood - Fall[i]n Back," and below that: ["Song - MoneyBag Myers"]?

A. Correct.

Q. The ["Artist - MoneyBag Yo"]; correct?

A. Correct, ma'am.

Q. On the right it says, [] "[#]unbreakable," below that [] "[#]1300!" [], "P-20[-]Vill." Do you know what the reference of 1300 is?

A. I do not know what 1300 is. Vill would be [Winder] Village.

Q. Below that it says, "[#OTF-FTO]," and then [] "[#]solid," with what appears to be [a hand-drawn image of] a strong arm; correct?

A. Solid, I've seen that before. It usually means solid, stay strong.

Q. Okay. Did you have an opportunity to do research and determine what that song is, the MoneyBagg Myers song?

A. Yeah, I pulled the lyrics up, and I looked at the lyrics.

that, pursuant to Pa.R.E. 403, the letter's probative value was outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Appellant's Brief, at 18. Specifically, Williams argues that the letter "did nothing to prove [Williams] killed anyone on May 4, 2018," that the letter "portrays its writer as a filthy[-]mouthed but scared young man hoping for some support from friends and neighbors," and was a "racially charged piece of evidence at the trial of a black man for a crime committed in a black neighborhood" that was "unfairly inflammatory and of no relevance to the issues at hand." *Id.* at 18-19. Finally, Williams claims he deserves a new trial and that "[t]his Court should send a message to trial courts that evidence that needlessly racially stereotypes a criminal defendant, when not absolutely necessary to prove some point at trial, cannot be viewed by the finder of fact upon pain of reversal[.]" *Id.* at 20.

_____

\* \* \*

Q. And looking from the left—and of course [Williams' letter to Flemming] will speak for itself—on the fourth one down, there's a [hand-drawn] musical note or a clef sign. To the right of that is[:] ["]Song[-]MoneyBag Myers,["] and below that, ["]Artist[-]MoneyBag Yo.["] And you say you have the lyrics of that song?

A. Yes, sir.

[Whereupon copies of the song's lyrics were distributed and published to each member of the jury and the song was played in court.]

N.T. Jury Trial, 3/18/19, at 313-19.

As noted above, all relevant evidence is admissible, except as otherwise provided by law, and irrelevant evidence is inadmissible. Pa.R.E. 402. One noted exception is found in Rule 403, which states "[t]he court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

Our Supreme Court has explained that all evidence is necessarily prejudicial:

> Probative value and prejudice are conjoined in the sense that if evidence is probative at all, it is necessarily prejudicial to one side or the other—if evidence has no probative value, it ought not be admitted in the first place, and this can usually be determined before trial. The balancing inquiry, however, is a fact- and context-specific one that is normally dependent on the evidence actually presented at trial. The value of evidence is obviously a fluid notion, and the prejudicial effect of the evidence is likewise in flux as matters progress.

*Commonwealth v. Hicks*, 91 A.3d 47, 53-54 (Pa. 2014).

Here, Williams argued a mistaken-identity defense throughout trial and in closing argument. *See* N.T. Jury Trial, 3/20/19, at 155-56. Contrary to Williams' claims, we find that the letter he wrote was clearly probative of his identity as the shooter insofar as the letter, penned by his hand, states "Shoota – Joey Twin IAMAL" next to the hand-drawn image of a gun and underneath the words "Target – B.A.M SNM." Moreover, a hand-drawn illustration found on the letter matched an image that was observed on the red shirt worn by Williams during the shooting—the same shirt Williams

abandoned at the Skelton residence in an attempt to hide his identity as the shooter—when he fled the scene and hid the firearm in the grill behind 703 Winder Drive. *See* N.T. Jury Trial, 3/7/19, at 175; N.T Jury Trial, 3/18/19, at 277-80, 286, 312-13, 324. This same image also appeared on the later-abandoned shirt worn by Flemming at Williams' trial.

Additionally, Williams fails to identify what specific language or content in the letter unduly prejudiced him. Although there is some use of profanity and racial slurs, we agree with the Commonwealth that the true focus of the letter is on providing an update on his case, noting Williams' belief that he will be acquitted of the charges, and requesting continued support. We discern no abuse of discretion in the trial court's decision to admit the letter as highly probative evidence of Williams' identity as the shooter. *See McClure*, *supra*. Finally, we note that any unfair prejudice was mitigated by the court's proper cautionary instruction to the jury regarding how the letter should be appropriately considered.[17] *See Commonwealth v. Jemison*, 98 A.3d 1254,

---

[17] The court cautioned the jury as follows:

> I want to address another matter with you. Yesterday we had Detective Frank Groome testify as a witness[. P]rior to his testimony you saw some evidence, a red T-shirt. Detective Groome highlighted the fact that [t]his T-shirt, which was found in a trash can, allegedly had a specific unique type of silkscreen logo on the front. You were made aware of that, and we also saw it as an exhibit.
>
> There was a letter that was written by this [d]efendant, Joseph Williams, and of that there is no dispute. You can accept that.

And it has on it what appears to be a handwritten logo similar to the logo that is silkscreened on the T-shirt. Whether it is or not is a fact for you, but that's my view of why the Commonwealth sought to introduce it. I believe, and they will argue if they choose, that **that somehow establishes the identity of the owner of the T-shirt to** [*sic*] **Joseph Williams. But again, it's for you to determine if that has been proven, and if, in fact, it is an important issue.** In the end, what is important is a decision for you and you alone. You determine the weight to be given any evidence, and I'll discuss that with you at the end of the case.

Having said that, in that letter there was a reference to a rap song. The Commonwealth will argue that **this again establishes the identity of the writer of the letter and is connected to the T-shirt,** but again, I'm not saying it's so; only what I believe the Commonwealth will argue. I permitted the playing of this rap song for you, and the Commonwealth provided two pages of lyrics for that song. Now, it is nothing more than a rap song, and I would not want you to think that it had any special value or evidentiary importance in and of itself. It is clear that [Williams] did not write this song. **He only referred to it in a letter, which apparently bears the same logo as the T-shirt.**

I'll be candid with all of you. We are all adults. This song is somewhat graphic in some measure, but it has no implications whatsoever as to the ultimate issue in this case, which is, has the Commonwealth proven beyond a reasonable doubt each and every element of every crime charged as against [] Joseph Williams, and [] Gary Goddard. The song, without more, is just one of many pieces of evidence you'll consider, but it has a limited purpose, and I didn't want you to draw the inference that this song proves anything. It certainly does not stand alone, just a part and parcel of[,] and it absolutely does not implicate, in any fashion, in any of these crimes, either Mr. Williams or Mr. Goddard, and I would not want you to think that it did.

So having told you that, it is only offered for a limited purpose. In the end, whether or not it has evidentiary value for you will be determined, but I can tell you now, and I can't stress it enough, Mr. Williams did not write this song. **No one is suggesting he endorses any of the things said in the lyrics, and it**

1263 (Pa. 2014) ("Any possibility of unfair prejudice is greatly mitigated by the use of proper cautionary instructions to the jury.").  The jury is presumed to have followed the court's instructions.  ***Id.***  Therefore, Williams' second claim on appeal fails.

Judgment of sentence affirmed.

Judgment Entered.



Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/26/2021

---

**absolutely has no bearing whatsoever on whether or not he is guilty of all, any, or none of these crimes**.  I just wanted you to know that.

N.T. Jury Trial, 3/19/19, at 11-14 (emphasis added).