J-S41045-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANI : | IN THE SUPERIOR COURT OF PENNSYLVANIA | |
| : | | |
| v. : | | |
| : | | |
| : | | |
| JOSEPH MICHAEL WILLIAMS JR. : | | |
| : | | |
| Appellant : | No. 25 EDA 2024 | |

Appeal from the PCRA Order Entered November 13, 2023
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0007352-2018

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANI : | IN THE SUPERIOR COURT OI PENNSYLVANIA | |
| : | | |
| v. : | | |
| : | | |
| : | | |
| JOSEPH WILLIAMS : | | |
| : | | |
| Appellant : | No. 27 EDA 2024 | |

Appeal from the PCRA Order Entered November 13, 2023
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0004366-2018

BEFORE:  MURRAY, J., KING, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                **FILED FEBRUARY 28, 2025**

Joseph Williams ("Williams") appeals from the denial of his first petition

pursuant to the Post Conviction Relief Act ("PCRA").[1]  We affirm.

This Court has previously set forth the trial facts as follows:

> Williams' convictions stem from his role in the shooting
> deaths of Tommy Ballard [("Ballard")] and Zyisean McDuffie

---

[1] ***See*** 42 Pa.C.S.A. §§ 9541-9546.

[("McDuffie")] outside of April Coleman's home . . . in Bristol, Pennsylvania, on May 4, 2018. On that date, Coleman hosted a party for her two children who planned to attend their high school prom later that evening. Several family friends were present, including Williams, Gary Goddard, Jr. ["Goddard"], Tajon Skelton, Rayshaun James, and Sincere McNeil. These individuals were all gathered around Coleman's Chrysler Pacifica, which was parked on her front lawn area. At one point, James and Williams walked away together—outside the view of area pole cameras—so that James could discreetly give Williams a firearm . . .. Shortly thereafter, McDuffie arrived at the Coleman residence, approached the group at the Chrysler Pacifica, and shook hands only with Williams. Williams then asked why McDuffie did not acknowledge the others, at which point McDuffie stated that he "didn't mess with none of [them]" and called them all "bitch." At the end of the verbal confrontation, McDuffie left, stating he would return soon.

When McDuffie returned about forty-five minutes to an hour later, he was accompanied by Ballard, Jahmier Wilson, and Jackie Valentine; Williams and Wilson then walked away together to have a private conversation. Within the larger group, still standing around the Chrysler Pacifica, an argument ensued amongst Goddard[] McNeil, McDuffie, and Ballard. McDuffie punched Goddard [,] . . . and within moments, Williams removed the firearm from his waistband and began firing it at Wilson, who was running away from him. . .. [W]ilson was not injured, but McDuffie and Ballard were struck. Ballard collapsed in the front yard of 911 Elmhurst Avenue and McDuffie was struck but still standing in the driveway of 916 Elmhurst Avenue [the house next to Ms. Coleman's].

Gary Goddard then appeared . . . with his hand raised and wielding a firearm. Standing in front of 916 Elmhurst Avenue, Goddard fired in the direction of the homes, and then at McDuffie, whose legs gave out from under him after the shots were fired. Goddard stood over McDuffie and discharged his firearm, lodging a bullet in McDuffie's head just above the hairline.

Williams, Skelton, and James fled the scene of the shooting towards Skelton's home, located at 816 Winder Drive. After only a short time, Lemuel Skelton, Skelton's father, became aware of the shooting, and directed Williams and James to leave his residence. Before leaving, Williams took Tajon Skelton's white

polo shirt. When police arrived at the Skelton residence, officers found Williams'[s] abandoned red shirt in a trashcan . . ..

While conducting a search in the area of the shooting, police observed Williams running shirtless through a wooded brush area with James. Officers overheard Williams tell James, "Don't worry about it; you didn't do nothing wrong." Upon being discovered by the officers, Williams stated to the police, "Sir, please put me in handcuffs. I don't want to die." Police found Tajon Skelton's white polo shirt in Williams'[s] pants pocket.

The officers subsequently reviewed video footage from pole cameras near the scene of the shooting. In the footage, police observed Williams, James, and Skelton running away from the shooting down Winder Drive. Williams was wearing a red shirt as he fled the scene. The three fleeing individuals entered the backyard of 703 Winder Drive, remained off-camera for one minute and thirty seconds while in the yard, and reemerged on camera travelling further down Winder Drive. The footage of Williams running shows his hands located around his belt area prior to entering the rear yard of 703 Winder Drive, but after leaving, his hands were no longer in his belt area. Police were dispatched to that address, where the owner of the property consented to a search. Police noticed a grill, which was completely covered in dirt and grime, except for the left handle. After searching the grill, police recovered a Rossi .38 Special revolver sticking out of the back near the propane tank. All five of the revolver's cartridges were spent, and it contained shell casings. Skelton confirmed through testimony at trial that Williams was the only one who approached the grill when the three individuals were in the rear yard of 703 Winder Drive.

Other testimony revealed that Goddard[], chased Wilson from the scene of the shooting, gun in hand and pointed forward with his arm fully extended.

When police arrived at the scene, Officer Michael Sarciewicz first found Ballard, who was still able to talk and move, lying in the grass at 911 Elmhurst Avenue. A crowd then directed the officer to McDuffie, who was unresponsive, located in front of 916 Elmhurst Avenue. The officer observed bleeding and several gunshot wounds on McDuffie[] and commenced cardiopulmonary resuscitation (CPR). McDuffie and Ballard were both transported

to Frankford-Torresdale Hospital, where McDuffie was pronounced dead on arrival, and Ballard pronounced dead shortly after arrival.

Doctor Zhonghue Hua conducted the autopsies of Ballard and McDuffie. Ballard was nineteen years old and suffered three gunshot wounds . . . [including] one to his left lower chest area, which punctured his liver and injured the right kidney. . .. The bullet from Ballard's first wound, which was still lodged in his body, was removed and turned over to investigators. Doctor Hua determined that the wound to Ballard's torso was the cause of his death[] and deemed it a homicide. McDuffie was also nineteen years old and suffered five gunshot wounds, including one each to his forehead above the hairline, his left upper back, his right flank, his right kneecap, and a graze wound to his right upper chest. Doctor Hua determined the fatal injury was the gunshot wound to his right flank, which punctured McDuffie's kidney. Intact bullets were removed from McDuffie's kneecap, head, and abdomen, and were turned over to investigators. Doctor Hua concluded McDuffie was still alive at the time he was shot in the head . . ., the cause of death was multiple gunshot wounds, and that the manner of death was homicide.

Police additionally removed two bullets from 914 Elmhurst Avenue—one had been lodged in the siding of the residence; the other entered a window, proceeded through the kitchen, through a box of cereal, and into the wall before striking a flue and falling onto the utility room floor. Eric Nelson, [a] Montgomery County [d]etective[], conducted a forensic examination of all six of the recovered bullets. The bullet recovered from the utility room and the one recovered from McDuffie's skull were discharged from a .32 H&R revolver found by police in [Goddard's] apartment. The fatal bullets recovered from McDuffie's abdominal wall and Ballard's right torso were shot from the .38 Rossi Special firearm, which was recovered from the grill behind 703 Winder Drive. The other bullets recovered from McDuffie's right knee and the siding of 914 Elmhurst Avenue were not traced to a known firearm, but were revealed to have been fired from a firearm similar to a .38 revolver or .9 mm pistol.

*Commonwealth v. Williams*, 245 A.3d 710, 712-14 (Pa. Super. 2021)

(footnotes and record citations omitted, indentation added).

Police arrested Williams in connection with the killings and later charged him separately with selling or transferring a firearm. The court granted consolidation of the charges with the case against Goddard and severed the charge of persons not to possess firearms.

At Williams's and Goddard's joint trial, Detective Frank Groome ("Detective Groome") testified he observed the red shirt discarded in the Skelton's trash can and observed it had a distinctive silkscreen logo with an electrical cord and outlet. **See** N.T., 3/18/19, at 278-81.[2] Detective Groome testified William Flemming, who attended part of the trial and sat behind the defense table, wore an identical red shirt with the silk screen logo. **See id**. at 286. Detective Groome testified he later came into possession of a letter Williams wrote to Flemming from prison that contained a hand-drawn image like the silkscreen logo. **See id**. at 312-14. In the letter, Williams asserted he drew the image, and referred to a song called "Moneybagg Myers," and to Winder Village, the area of the crimes. **See id**. at 315-17. Over Williams's

---

[2] As this Court explained on direct appeal, prior to trial[,] the court instructed members of the audience not to wear matching t-shirts containing images or nicknames of Commonwealth witnesses; nevertheless, certain individuals wore matching shirts supporting Williams to trial and were admonished by the court. **See Williams**, 245 A.3d at 720. Flemming, one of the people the court admonished, left his shirt in the courtroom. It bore the identical silkscreen logo to the one found on the shirt Williams abandoned in his flight from the crime scene, which was also the same image Williams used on the letter he wrote from prison to Flemming. **See id**. Flemming's abandoned shirt included a variety of phrases that appeared in the letter. **See id**.

objection, the court allowed the jury to see and hear the song's lyrics. *See id*. at 318-20. Detective Groome testified he recovered multiple tee shirts from Flemming, one of which contained the phrases "free Joey"[3] and "TTB Savage," which is Williams's Facebook name, and that the name Savage appears in the song, "Moneybagg Myers." *See id*. at 325-27. The next day, with the express agreement of defense counsel, the court gave a cautionary instruction to ensure the jury did not give special weight to the lyrics of the song, which was referenced in Williams's letter to Flemming. *See* N.T., 3/19/19, at 8-9.

A jury convicted Williams of two counts of first-degree murder, and one count each of criminal attempt to commit homicide, firearms not to be carried without a license, recklessly endangering another person (REAP), possessing an instrument of crime (PIC), and tampering with or fabricating physical evidence.[4] The court imposed consecutive life sentences for the two murders and concurrent terms of imprisonment for Williams's other offenses. Williams filed a post-sentence motion which the court denied. New counsel filed Williams's appeal in this Court. In January 2021, this Court affirmed Williams's judgments of sentence. *See Williams*, *supra*. The Supreme Court denied Williams's petition for allowance of appeal. *See Commonwealth v.*

---

[3] Williams is known as "Joey." *See* N.T., 3/18/19, at 325-27.

[4] The court then granted the Commonwealth's *nolle prosequi* motion on the charge of possession of a firearm by a person prohibited.

***Williams***, 261 A.3d 1034 (Pa. 2021). Williams did not file for a writ of *certiorari* to the United States Supreme Court.

Williams filed a *pro se* PCRA petition. The court appointed instant counsel, who filed an amended PCRA petition. The PCRA court issued a Rule 907 notice of its intention to dismiss the petition without a hearing. Williams filed a response to the court's notice. In November 2023, the court dismissed the petition without a hearing. Williams timely appealed and he and the trial court complied with Pa.R.A.P. 1925.

On appeal, Williams raises three issues for this Court's review:

1. Did [Williams's] attorney . . . on appeal, fail to properly preserve and argue the defense objection to the playing and publishing to the jury[] [of] certain rap music lyrics[] on the basis of overt prejudice, the racial[ly] inflammatory nature of the song and lyrics, racial bias, as well as the lack of relevancy of another's literary work to the issues involved in the homicide trial?

2. Were [Williams's] attorneys ineffective when they failed to object, as noted by the trial court in its opinion, to the prosecutor's statements during closing arguments that mischaracterized the DNA evidence, and the testimony of the prosecution's DNA expert witness, regarding the presence of [Williams's] DNA on the Rossi firearm, thus precluding any review of the issue on appeal?

3. Did the [PCRA] court err in denying [Williams] an evidentiary hearing pursuant to the [PCRA] inasmuch as [Williams] had issues meritorious of review that could only be properly considered following an evidentiary hearing?

Williams's Brief at v (capitalization standardized).[5]

_____

[5] For the convenience of review, we have reordered Williams's issues.

Williams's first issue asserts direct appeal counsel's ineffectiveness for failing to preserve an objection to the playing and publishing of the song and its lyrics to the jury.

The following standards govern our review:

> Appellate review of a PCRA court's dismissal of a PCRA petition is limited to the examination of whether the PCRA court's determination is supported by the record and free of legal error. The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record. This Court grants great deference to the findings of the PCRA court, and we will not disturb those findings merely because the record could support a contrary holding. In contrast, we review the PCRA court's legal conclusions *de novo*.

*Commonwealth v. Maxwell*, 232 A.3d 739, 744 (Pa. Super. 2020) (*en banc*) (internal citations and quotation marks omitted). Further, a "PCRA court's credibility findings are to be accorded great deference, and where supported by the record, such determinations are binding on a reviewing court."

*Commonwealth v. Williams*, 141 A.3d 440, 452 (Pa. 2016) (internal citations omitted).

For a PCRA petitioner to obtain relief on an ineffectiveness claim, he must establish:

> (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's action or failure to act; and (3) he suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability the result of the proceeding would have been different. Counsel is presumed to have rendered effective assistance. Additionally, counsel cannot be deemed ineffective for failing to raise a meritless claim. Finally, because a PCRA petitioner must establish all the [ineffective assistance test] prongs to be entitled to relief, we are not required to analyze the elements of an ineffectiveness claim

in any specific order; thus, if a claim fails under any required element, we may dismiss the claim on that basis.

*Commonwealth v. Treiber*, 121 A.3d 435, 445 (Pa. 2015) (citations omitted).

Williams asserts direct appeal counsel was ineffective for failing to preserve a challenge to the playing and publishing of lyrics of "Moneybagg Myers" to the jury. He asserts direct appeal counsel erroneously concluded trial counsel waived the issue by accepting a cautionary instruction; Williams also asserts the issue can only be resolved *via* trial counsel's testimony. *See* Williams's Brief at 12-18.

The PCRA court stated that trial counsel preserved an objection to the playing and publishing of the song's lyrics, and that the trial court and this Court determined on direct appeal the letter and lyrics were admissible to refute Williams's misidentification claim. *See* PCRA Court Opinion, 3/12/24, at 7. The PCRA court explained that Williams's letter told Flemming to listen to the rap song, which referred to "Savage" and "Savage-Hearted," Williams's social media name was "Savage," and Williams's Facebook page referred to "TTB Savage 1300," which was probative to refute Williams's misidentification claim. *See id*. at 9. The PCRA court further noted the trial court gave a cautionary instruction that addressed the letter and the song's lyrics and concluded the instruction cured any possible prejudice. *See id*. at 723. The PCRA court quoted the trial court's instruction, which this Court also quoted on direct appeal:

Yesterday[,] we had Detective Frank Groome testify as a witness, and prior to his testimony you saw some evidence, a red T-shirt. Detective Groome highlighted the fact that this T-shirt, which was found in a trash can, allegedly had a specific[,] unique type of silkscreen logo on the front. . . .

There was a letter that was written by [Williams], and of that there is no dispute. You can accept that. And it has on it what appears to be a handwritten logo similar to the logo that is silkscreened on the T-shirt. Whether it is or not is a fact for you, but that's my view of why the Commonwealth sought to introduce it. I believe, and they will argue if they choose, that that somehow establishes the identity of the owner of the T-shirt to [sic] Joseph Williams. But again, it's for you to determine if that has been proven, and if, in fact, it is an important issue. . ..

Having said that, in that letter there was a reference to a rap song. The Commonwealth will argue that this . . . establishes the identity of the writer of the letter and is connected to the T-shirt, but again, I'm not saying it's so; only what I believe the Commonwealth will argue. ***I permitted the playing of this rap song for you, and the Commonwealth provided two pages of lyrics for that song. Now, it is nothing more than a rap song, and I would not want you to think that it had any special value or evidentiary importance in and of itself. It is clear that [Williams] did not write this song. He only referred to it in a letter, which apparently bears the same logo as the T-shirt***.

I'll be candid with all of you. We are all adults. This song is somewhat graphic in some measure, but it has no implications whatsoever as to the ultimate issue in this case, which is, has the Commonwealth proven beyond a reasonable doubt each and every element of every crime charged as against [Williams], and [Goddard]. The song, without more, is just one of many pieces of evidence you'll consider, but it has a limited purpose, and I didn't want you to draw the inference that this song proves anything. It certainly does not stand alone, just a part and parcel of[,] and it absolutely does not implicate, in any fashion, in any of these crimes, either [Williams] or [Goddard], and I would not want you to think that it did.

So having told you that, it is only offered for a limited purpose. In the end, whether or not it has evidentiary value for

- 10 -

you will be determined, but ***I can tell you now, and I can't stress it enough, [Williams] did not write this song. No one is suggesting he endorses any of the things said in the lyrics, and it absolutely has no bearing whatsoever on whether or not he is guilty of all, any, or none of these crimes.*** I just wanted you to know that.

***See*** PCRA Court Opinion, 3/12/24, at 10-11 (emphasis added), quoting N.T., 3/19/19, at 12-14; ***Williams***, 245 A.3d at 722 n.17. The PCRA court concluded it saw no reason to grant an evidentiary hearing on the issue, which had already been litigated, and further, "given the mountain of evidence presented against Williams at trial together with the entire record in this case, . . . the outcome of the trial would have been the same even if the song and its lyrics had been precluded from evidence." ***See*** PCRA Court Opinion, 3/12/24, at 11.

We affirm the PCRA court's ruling for the reasons the court cited and for other, independent reasons,[6] although we do not agree that this Court addressed the admissibility of the song's lyrics on direct appeal. Instead, this Court affirmed the admission of Williams's letter to Flemming to refute a misidentification defense and cited with approval the court's lengthy cautionary instruction that addressed the song's lyrics as well as the letter. ***See Williams***, 245 A.3d at 722 n. 17.

---

[6] Where the result is correct, we may affirm a trial court's decision on any proper ground even if not cited by that court. ***See Commonwealth v. Lehman***, 275 A.3d 513, 520 n.5 (Pa. Super. 2022).

Williams summarily asserts he was prejudiced by "the inflammatory nature of the song and its lyrics, [and] also because the literary works of another were attributed to [Williams] as inference of guilt." **See** Williams's Brief at 12. However, Williams fails to identify the specific language or content of the song that unduly prejudiced him, as he failed to do on direct appeal concerning the letter. **See Williams**, 245 A.3d at 722 (noting Williams "fails to identify what specific language or content in the letter unduly prejudiced him"). He thus asks this Court to determine the lyrics prejudiced him without any proof other than his own conclusory assertion. Moreover, Williams does not explain why the trial court's cautionary instruction, **which instructed the jury Wiliams did not write "Moneybagg Myers," and its lyrics were not evidence of his guilt**, failed to cure any possible prejudice from the lyrics, given the well-established principle that a jury is presumed to follow a trial court's instructions, **see id**., and the fact that on direct appeal this Court cited the cautionary instruction with approval. **See** id. at 722 n.17, 723. Williams thus fails to prove his ineffectiveness claim, requiring its denial. **See Treiber**, 121 A.3d at 445.[7]

_____

[7] Williams's assertion that his claim cannot be resolved without trial counsel's testimony is legally incorrect. Where a petitioner fails to prove any element of his ineffectiveness claim, that claim fails. **See Treiber**, 121 A.3d at 445. Williams does not, and cannot explain, how in the absence of prejudice, trial counsel's testimony could prove his claim.

Independent of these dispositive deficiencies of Williams's claim, the Commonwealth presented overwhelming properly admitted and uncontradicted evidence of Williams's guilt as this Court found on direct appeal, further defeating any possible assertion Williams suffered prejudice from counsel's alleged ineffectiveness. *See Williams*, 245 A.3d at 719. That evidence included, *inter alia*, the testimony of several eyewitnesses that Williams possessed and fired the gun multiple times, video showing his flight from the scene, and the recovery of the murder weapon hidden in a barbeque grill to which Williams had access immediately after his flight from the murder. *See id*.[8] For all these reasons, Williams's claim of ineffectiveness concerning the admission of the rap lyrics fails.

Williams next asserts his "attorneys" were ineffective for failing to object to the prosecutor's statements in closing argument concerning evidence of his DNA on the murder weapon, although he focuses his argument on the alleged impropriety of the prosecutor's remarks rather than counsel's conduct. Williams's Brief at 18-21.

The record shows trial counsel objected in advance to the prosecutor's anticipated argument, asserting the prosecutor would mischaracterize the DNA expert's testimony. *See* N.T., 3/20/19, at 129. The prosecutor

---

[8] Additionally, the evidence showed that during his flight Williams discarded the shirt he wore and exchanged it for a different one to avoid detection. *See id*. at 713.

responded that the Commonwealth would argue, consistent with the expert's testimony, that the no one could be included or excluded from touching the murder weapon based on the expert's testimony but that "each of the alleles that [were] reference in [Williams's] DNA profile was present at each of the locus locations in the mixture." *See id*. at 130. The trial court stated the prosecutor's argument appeared to be a fair comment but that it would rule on an objection if Williams made one during closing argument. *See id*. Williams did not object to the prosecutor's statement during closing argument.

As the Pennsylvania Supreme court has stated:

the phrase "prosecutorial misconduct" has been so abused as to lose any particular meaning. The claim either sounds in a specific constitutional provision that the prosecutor allegedly violated or, more frequently, like most trial issues, it implicates the narrow review available under Fourteenth Amendment due process. To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial. However, the Due Process Clause is not a code of ethics for prosecutors; its concern is with the manner in which persons are deprived of their liberty. The touchstone is the fairness of the trial, not the culpability of the prosecutor.

*Commonwealth v. Telford*, 960 A.2d 1, 29 (Pa. 2008) (internal citations and quotation marks omitted). *See also Commonwealth v. Judy*, 978 A.2d 1015, 1019 (Pa. Super. 2009) (recognizing that in evaluating a claim of prosecutorial misconduct, the relevant question is whether the defendant received a fair trial, not a perfect one).

The PCRA court found trial counsel did object to the Commonwealth's prospective argument and that the trial court addressed the claim at length

- 14 -

on appeal. **See** PCRA Court Opinion, 3/12/24, at 13-14. It further held the trial court properly rejected Williams's prosecutorial misconduct claim because "[t]he instant case did not rise and fall with the DNA evidence." **See id**. at 15, citing Trial Court Opinion 3/3/20, at 35 (reviewing the overwhelming evidence that, *inter alia*, multiple eyewitnesses saw Williams shoot the gun, and Williams concealed the gun in flight from the murders).

Again, we find no legal error although on somewhat different grounds than the PCRA court cited. Trial counsel arguably did not preserve a challenge to the prosecutor's closing argument where he did not act on the trial court's invitation to object at the time that argument was made. **See Commonwealth v. Cox**, 983 A.2d 666, 685 (Pa. 2009). However, the PCRA court is correct in focusing on the dispositive fact Williams's conviction did not rise or fall on DNA evidence: multiple eyewitnesses including Rayshaun James, Jackie Valentine, and Krystalyn Coleman testified they saw defendant fire the gun or saw him put it in his waistband immediately after the shooting. **See Williams**, 245 A.3d at 719. On this record, there is no basis to conclude Williams was denied a fair trial by the prosecutor's closing argument. **See Telford**, 960 A.2d at 29; **Judy**, 978 A.2d at 1019. Counsel therefore cannot have been ineffective for failing to preserve or raise a meritless claim. **See Commonwealth v. Davis**, 262 A.3d 589, 596 (Pa. Super. 2021). Williams's second claim therefore fails.

Finally, Williams asserts the PCRA court erred by denying an evidentiary hearing on meritorious claims "that could only be properly considered following an evidentiary hearing." **See** Williams's Brief at 11-16.

There is no absolute right to an evidentiary hearing on a PCRA petition; if the PCRA court can determine from the record that no genuine issues of material fact exist, a hearing is unnecessary. **See Commonwealth v. Maddrey**, 205 A.3d 323, 328 (Pa. Super. 2019) (citation omitted). To obtain a PCRA hearing, a petitioner must demonstrate that he raised a genuine issue of material fact which if resolved in his favor would have entitled him to relief, or that the court otherwise abused its discretion in denying a hearing. **See Commonwealth v. Paddy**, 15 A.3d 431, 442 (Pa. 2011). We review an order dismissing a petition without an evidentiary hearing for an abuse of discretion. **See Commonwealth v. Wilson**, 273 A.3d 13, 18 (Pa. Super. 2022).

Williams asserts he is due an evidentiary hearing to explore trial counsel's reasonable basis for his actions. **See** Williams's Brief at 14-15.

The PCRA court found Williams failed to raise a disputed issue of material fact, made no specific references to the record, documentation, or affidavits from trial court to support the grant of an evidentiary hearing. **See** PCRA Court Opinion, 3/12/24, at 4-6.

The PCRA court properly exercised its discretion in denying an evidentiary hearing. Williams failed to identify any disputed issue of material fact that would compel the grant of an evidentiary hearing. It is plain from

- 16 -

the record that Williams cannot prove prejudice, so there was no legal basis for an evidentiary hearing. **See Paddy**, 15 A.3d at 442; **Maddrey**, 205 A.3d at 328. The PCRA court thus did not abuse its discretion by declining to conduct an evidentiary hearing. **See Wilson**, 273 A.3d at 18.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/28/2025